UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re

Blue Beverage Group Inc.

Debtor.
-------------------------------------------------------x

Chapter 11

Case No. 19-22835

**Local Rule Statement**

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

Joseph Goldberger, as Managing Member of Blue Beverage Group Inc, ("Blue Beverage Debtor"), and Blue Beverage Group, LLC on behalf of 152 Broadway Haverstraw NY LLC (the "152 Broadway Debtor," together with the Blue Beverage Debtor, the "Debtors") deposes and says under penalty of perjury, as follows:

1. I am submitting this affirmation pursuant to the local rules of this Court in support of these Chapter 11 filings.

2. On April 18, 2019, the Debtors each filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

3. The 152 Broadway Debtor owns the real property at 152 Broadway, Haverstraw, New York (the "Property") valued in excess of $11,000,000. The Property is a manufacturing and office facility, pictured below:



4. Blue Beverage owns bottling plant machinery and equipment at the Property. The business is not operating.

5. From their inception, the Debtors operated a bottling plant as a single enterprise. The business incurred millions of dollars of vendor debt and loans. Since the Debtors operated as a single enterprise, the Debtors believe they are co-debtors for claims asserted in excess of $27,000,000.

6. The Property is also subject to a judgment of foreclosure and sale entered in Rockland County Supreme Court in favor of Sterling National Bank.

7. The Property, machinery and equipment have been wasting assets for years and must be sold promptly, but in an orderly way with adequate marketing, to stop the bleeding and preserve value for creditors that may be lost in a foreclosure sale.

8. Notably, the Debtors and their properties are the subject to litigation before this Court in *In re Broadway Equity Holdings LLC* (“BEH”), case no. 17-22242 (“BEH

Bankruptcy"), Adv. Proc. No. 17-8215 (the "BEH Litigation"). The BEH Litigation arises out of a Hebrew language agreement dated December 20, 2012 (the "Agreement," Exhibit A).

9. Under the Agreement, Joseph Goldberger and Joseph Menczer (the "Sellers") agreed to sell to Joel Wercberger and Aron Jacob Wolcowitz (the "Purchasers") an equity interest in the Debtors. The purchase price was fixed at the prior $21,500,000 investment of the Sellers, as adjusted, plus an amount equal to 20% of the $21,500,000 investment amount. (See paragraphs 4,5 and 6 of the Agreement).

10. Upon signing the contract, the Purchasers operated the business as manager (Agreement Par. 21). The Purchasers had to invest $4,800,000 and could cancel the deal if the $4,800,000 sum had to be exceeded (Agreement Par. 28). But significantly, and this goes to the heart of the dispute, if the Purchasers withdrew from the deal, they would not be entitled to any compensation for their work and activities, and they would be reimbursed for the principal of their investment over 36 months without interest. (Agreement Par. 19). Nothing in the Agreement entitled the Purchasers to a mortgage or a promissory note as part of the 36 month no interest repayment. The Debtors contend that the Purchasers created a fraudulent note and mortgage to transform their right to a $4,800,000 interest free unsecured claim for rescinding their equity investment, into an interest-bearing note and mortgage.[1]

11. Subject to the outcome of the BEH Litigation, therefore, the Debtors may be able to equitably subordinate the BEH claim under section 510(b) as a claim arising from

---

[1] It appears that the Purchasers paid a total of $5,300,000. Nothing in the Agreement permits the Purchasers to avoid the terms governing the $4,800,000 portion of the investment based on advancing additional amounts.

rescinding a purchase of securities and/or avoid BEH's claim as a fraudulent conveyance under section 544 of the Bankruptcy Code.

12. Moreover, there is evidence that the mortgage the Purchasers contend was signed by the Sellers did not have a property description, likely making it unenforceable, but the mortgage the Purchasers filed has a property description. Even if the BEH claim survives the litigation, its lien may be voidable.

13. Either way, this case is not being filed to stay or delay the BEH Litigation and the Debtors consent to moving forward with the Trial, with their avoidance, equitable subordination and related claims preserved.

14. Meanwhile, the Debtors intends to obtain a bar date, file a liquidating plan, and sell the Debtors' assets to benefit all creditors, and possibly equity holders.

Dated: New York, New York
     April 18, 2019

                                      s/Joseph Goldberger, as Managing Member of Blue
                                       Beverage Group Inc,



TARGEM
TRANSLATIONS

T 718 384 8040
F 718 388 3516
E info@targemtranslations.com
W TargemTranslations.com

## CERTIFIED TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service with a firm track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from Hebrew to English and vice versa; and they have professionally translated the document referenced as **"Blue Beverage Group Contract"** from Hebrew to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: April 25, 2017

Wolf Markowitz

Signature of Notary

ROCHAL WEISS
Notary Public, State of New York
Registration No.: 01WE6293785
Qualified in Kings County
My Commission Expires December 16, 2017

*Translation from the H E B R E W language*

By the Grace of G-d

**Commitment to Sell Contract**

MEMORANDUM of the provisions, conditions and manners, of the sale and commitment that were discussed and negotiated between the following parties, i.e. Mr. Jonathan Joseph Menczer and his partner Mr. Joseph Yechiel Goldberger, the sellers * *or their heirs*, [they are both equal partners, half and half], referred to hereinafter as Party A; and Mr. Joel Wercberger and his partner Mr. Jacob Walkowitz, the buyers ** *or their heirs*, [the 2 partners comprising Party B are not equal partners; rather, it is all in accordance with an agreement between them], referred to hereinafter as Party B; the two parties accepted upon themselves and they committed themselves through binding procedures and methods that are most useful according to the rule of the holy Torah and state law, to confirm and to establish all that is provided and specified in this contract.

**The Business being Sold**

1) Party A owns the firm known as **Blue Beverage Group**. The firm posses a large property of more than 15 acres, and on it there is also an bottling plant complete with all equipment and tools for a bottling system. The firm provides bottling services for many firms. At this time, it was decided to sell Party B the entire aforementioned firm with all of the property around it, and everything associated with it and all its rights which Party B is interested in buying; the parties therefore reached agreement whereby Party A will sell them the firm under the following provisions:

2) The sale includes:

   A. The aforementioned firm, known as **Blue Beverage Group**, together with all customers and contractors;
   B. All equipment and tools currently owned by the aforementioned firm; Party B has already visited the firm and has seen everything with his eyes and accepted it all "as is", and even if any machine breaks down, etc., it shall not be deducted from the sale amount.
   C. The entire lot at the address of 152 Broadway, Haverstraw NY, in the size mentioned above.
   D. The buildings currently situated on the property and owned by the firm.
   E. Even the vacant buildings on the property that serve for storage.

**Purchase Price and Sale Process**

3) Party A has already invested in the sale the sum of approximately twenty one million five hundred thousand dollars, $21,500,000, [according to accounting records, it is possible that the investment was less than that or maybe even more; over the course of the upcoming months the exact sum will be determined and it will be added to this contract bearing the signatures of the 2 parties]; the firm has already delivered it income in a

certain amount throughout the years, and on top of the aforementioned sum, Party A has also taken out a mortgage against the firm for the sum of six million dollars, $6,000,000, for which payments are made to the bank every month.

4) [The purchase price - how much of it is for the firm and how much of it is for the building, depends on the opinion and appraisal of Party B and its representatives.

5) The purchase price is set at the sum of twenty percent, 20%, of the entire amount of principal investment that Party A invested in the sale; i.e. the parties will conduct a thorough accounting of all investments made over the course of time; they will deduct from that amount all income realized by Party A to its coffers throughout the years, [~~the firm's income throughout the years~~]; they will also deduct the sum Party A pocketed from the mortgage they obtained against the building; they will deduct from the expenses account the costs of the mortgage and payment they paid for it; [investments by Party A that proved to be unsuccessful, even if they lost in the end (wasted money), will not be deducted at all, and it is upon Party B to pay it in full]; and after all calculations, when they will have the exact amount how much of Party A's principal investments are currently retained in the firm, after deducting all income; on top of this amount, Party B will add an additional twenty percent, 20%; when it will pay these amounts, then all payments for the sale are complete.

*Party A: {sig.} Jonathan Joseph Mencer {sig.} Joseph Yechiel Goldberger*
*Party B: {sig.} Joel Wercberger {sig.} Aron Jacob Walkowitz*

6) Besides the purchase price, Party B will accept the firm with all liens stemming from debt that was invested in the firm and the mortgage on it; for which it is responsible. However, Party B is not responsible for the other liens.

7) Party A committed itself in a manner most useful according to the holy Torah and state law, to sell Party B the aforementioned sale for the aforementioned amount, when Party B will deliver to it the sum of 60% of all the funds; beginning today, Party B is able to deliver the funds and to buy the aforementioned sale pursuant to the provisions of this contract and for the aforementioned amount. Immediately upon delivering the sum of the purchase price of 60%, the entire sale immediately transfers to his possession and for his benefit; the balance of the purchase price of forty percent, 40%, will be imposed as an *Isska*[1] debt against Party B, which it will pay within 4 years from the date this contract is signed, with a compromise fee of 8% per annum; it is upon Party B to provide appropriate security both for the principal funds and for the *Isske* profit, based on attorney Norman Seidenfeld's opinion.

8) The entire business and the property and the buildings are currently recorded in government files under a corporation founded by Party A. From now on, all of them will be recorded as per the attorney Mr. Norman Seidenfeld, who was selected with the blessing of the parties so both of them are secure; the same will be done vis-à-vis the buildings and the property; this way, each of the parties is secured that it will get that which is becoming it under this agreement.

[1] A certain transaction under which Jewish law does not prohibit charging/paying interest

9) Party B is entitled to decide to purchase only half of the sale as it wishes and the rest should stay with Party A, [however, there is no requirement upon Party A to sell less than half], and all commitments that Party A committed itself towards Party B to sell it the full sale also apply towards half of the sale; on the contrary, Party A prefers to sell half the sale than to sell it all.

10) Should Party B indeed decide to purchase only half the sale, the parties will then become partners amongst themselves, and they will then determine the provisions of the partnership and the parties' obligations in a manner the parties will agree to. In general, all parties will have rights and obligations proportionate to their interest and holding in the firm; in any event of partnership, there is no greater obligation upon Party B to be actively involved with the firm, than there is upon Party A.

11) It is agreed that the purchase price set above applies only if it purchases the entire sale for itself, but if Party B agrees to stay as a partner with Party A under which Party A retains half of the sale, Party A will lower for it the purchase price so Party B will pay only half the principal amount that was left with the firm from Party A's investments throughout the years; they will also include the funds which Party B invested over the course of time and they will deduct half the invested amount from the amount Party B is required to pay for the sale.

12) The time of purchasing the sale is set at the time when Party B will deliver the purchase price, but no later than within 2 years from the date of signature, when it is to pay at least 60% of the purchase price sum, and the balance of 40% of the purchase price principal will be paid within four years from the date of signing this contract, plus interest in a permissible manner in the amount of 8% of the principal sum of 40%, and the rest of the purchase price of 20% profit will be paid within 4 years of today, free of *Isske*; and Party A is to be secured as per the attorney's opinion, as provided above.

13) Upon expiration of two years and Party B having failed to pay 60% of the purchase price, and the delay is not caused by Party A, on the following day the commitment expires and Party A is entitled to sell the sale to whoever it wishes and at a price it wishes, and Party B cannot keep it from doing so at all; Party B will be reimbursed for the funds it invested over the course of time, in payments that will be divided over a period of 3 years, (36 calendar months), interest free.

14) In the event there will be any delay because of Party A where the sale is delayed because of it, whether it is title issues, or a Rabbinical Court injunction, or a schism between the partners making up Party A, etc. on any matter whatsoever, then, after Party A will settle the delay, Party B will have 3 more months to complete the sale, and during the time of the delay as well as the subsequent 3 months, they will handle all issues like within the two years.

15) Anywhere the contract mentions payment over 36 months or 60 months  1) the funds go back free of paying *Isske* profit;  2) it does not mean that a payment is to be made every

month, only every quarter year, so that there would be a total of 12 payments; 3) however, if there will be funds in the firms account, Party B will deposit in the firm's account an amount that approximately equals the expenses to operate the firm for the upcoming 3 months, plus there will also be inventory in the firm in the value of $________ like the business currently has, or it will deposit funds in the aforementioned amount together with funds in the business account, - then Party B will immediately receive and it will deduct it from the investment account of Party B; it is only the rest of the funds that are not in the firm's account that Party B will receive in payments of 36 months; 4) Party B will also receive security and guarantees for its funds, based on attorney Norman Seidenfeld's opinion.

*Party A: {sig.} Jonathan Joseph Mencer {sig.} Joseph Yechiel Goldberger*
*Party B: {sig.} Joel Wercberger, {illegible signature}*

16) In the event mentioned in sec. 13 above, then there are no claims by Party B for the work he performed for the firm over the course of time, nor for his improving the firm over the course of time, for even if he improved the firm he will get back only the principal amount of his investment and nothing more.

17) Party B is authorized to obtain a mortgage from the bank against the building and assets of the firm, both on the firm itself, and on the firm's buildings, and Party A committed itself to sign all necessary documents and to make a vigorous effort to make available everything that is necessary the accomplish the goal, and it will also sign that it accepts upon itself responsibility as required by the bank * *if needed they will add Party B as signor** [and after paying 60% of the funds, they will have an attorney remove Party A's responsibility from the mortgage, if possible]; the mortgage funds will be placed in escrow with the attorney Mr. Norman Seidenfeld, and Party B will be authorized to utilize the funds 1) for the purpose of funding the firm during the initial years, as it has committed itself to pay for funding the firm up to 4.8 million dollars; interest payments will be from Party B's pocket pursuant to a *Heter Isska*; 2) for the purpose of paying Party A the purchase price and thereby acquire the firm into his possession; interest on these loans will be paid from Party B's pocket pursuant to a *Heter Isska,* [even if Party B ultimately will not buy the firm, Party B will have to pay the mortgage payments throughout the 36 months]; 3) if there will sufficient funds in the mortgage, in excess of 4.8 million dollars, party B is authorized to create a new line as needed, after notice to Party A, or a new service with the consent of Party A; however in case of this sec. 3, the interest will be paid from the firms funds, not from Party B's pocket.

18) At this time, there is a mortgage on the firm's building with interest payments of 7%, and another private loan on the firm with interest payments of more than 12%; Party B is authorized to obtain a big mortgage of which he will pay off these old loans too, and if Party B succeeds in securing such loans with a lower interest rate that is currently being paid, the gain will be allocated to Party B; Party B may take mortgage payments from the firm's account up to the sum the firm currently pays, whereas Party B will pay from its pocket only the payment amount in excess of the existing amount: for instance, if they currently pay $10,000 interest on the loans, and after he succeeds to obtain a big mortgage they will pay a total of only $12,000, then Party B is authorized to pay the sum

of $10,000 from the firm's funds, and he will add just $2000 from his pocket; if he succeeds to obtain a big mortgage with total payment of only $9,000 monthly, then he will not add anything from his pocket, [however, he will not withdraw from the firm the $1,000 gain that he generated for them].

19) If Party B breaches the contract and decides within the two years that he reverses course and is not interested in continuing with the deal, he shall provide Party A 90 days advance notice that he intends to cancel the deal, and after 90 days from the day of notice the deal is canceled; he will be subject to the above, that he has no claim for his effort and activities over the course of time, and he will be reimbursed for the principal of his investment in payments of 36 months without interest payments.

20) However, if Party B announces that he intends to cancel the sale prior to the end of 6 months, which means that the deal is canceled within 9 months, then, besides the fact that he will not receive anything for his effort over the course of time, the sum of two hundred fifty thousand dollars, $250,000, will be deducted from his principal investment as a penalty, and he will be reimbursed only the balance of the money only, in payments of 36 months; if his investment has not reached the level of two hundred fifty thousand dollars, $250,000, it is upon him to add from his pocket up to that amount.

**Provisions and Particulars of the Sale**

21) Immediately from this day, Party B will enter to start working as manager within the firm; he accepts upon himself full responsibility of the sale in its entirety, and he will supervise all employees to ensure they fulfill their duties in full; it is upon Party B to regularly travel to the plant location as needed in order to supervise and manage from up-close on everything that is going on; it is upon him to make an effort on behalf of the business responsibly and loyally, as if the entire business was his and the investment was his alone.

22) Party B will hire a plant manager; he will look for a suitable and competent person to perform the job; this employee will always be at the plant to control all aspects of the firm, and Party B will constant communicate with him.

23) Party B's activities include that he is responsible to arrange for: 1) advertising the firm's quality and benefits to the public through effective advertising; 2) to pursue and market the firm to clients; 3) to accept orders from buying clients, and arrange that they receive their order timely; 4) the oversee and supervise all employees to do their duties completely and expeditiously, without laziness; 5) to find

*Party A: {sig.} Jonathan Joseph Mencer {sig.} Joseph Yechiel Goldberger*
*Party B: {sig.} Joel Wercberger {sig.} Aron Jacob Walkowitz*

loyal employees and work with them and supervise them to provide good customer service to customers' satisfaction; 6) to keep track of all employees to pay them their wages timely, as well as to pay utility bills and other expenses of the firm etc. on time; 7) to make sure to demand and collect from the customers to pay their balances on time;

8) to outsource to a writer, to write down an exact accounting of all income and expenses, neatly and organized.

24) Party B committed themselves that between both of them they will work on behalf of the firm [specifically within the plant or traveling on behalf of the firm] at least 40 hours per week.

25) In the event of an urgency with Party B, such as an illness etc. G-d forbid, he is authorized to name an employee to substitute him according to the aforementioned provisions, and the costs of the employee is upon Party B.

26) In the event Party B is negligent with management of the firm, Party A will turn to the 'agent' below, Mr. Benzion Goldberger, and if he too will determine that Party B was negligent with management of the firm, Party A is entitled to back out of the deal, and Party B will pay party A a penalty of a million dollars; if Party B's investment was more than a million dollars, Party A will reimburse his investment over a period of 60 months.

27) However, negligence in the firm is limited to 'gross negligence' only, one that stems from disregard and carelessness. The one to determine what is defined as 'gross negligence' will be Rabbi Abraham Baruch Rosenberg together with rabbi Daniel Geldtzeler or Mr. Jacob Yochanan Mendlowitz; only if they both decide that it was 'gross negligence' the penalty in the foregoing clause applies; however, practically, even if Party B commits gross negligence, if party B decides to buy the business immediately upon paying the sum of 60%, whenever it is, within two years or within 3 months following the Ruling and decision by the decision makers [if the Ruling occurs after two years], then there are no claims against him anymore; however, upon expiration of 2 years after the signing, or after 3 months following the Ruling, if there is one, Party B no longer has the right to buy the business, as mentioned above.

28) All costs of funding the firm during the period of time till the purchase, including: employees' wages, taxes, insurance, ordering bottles, labels, etc. rest on Party B alone, and he has to invest everything necessary in the firm up to the sum of 4.8 million dollars, $4,800,000; if the investment exceeds this sum, Party B has the option to back out of the deal, and he will be reimbursed for his investment in installments of 36 months.

29) The aforementioned investment is limited only to fund the firm as is; however, if Party B decides, with Party A's consent, to introduce a new service in the firm, etc., or a new line of the existing services, then that investment is not included in the calculation of the investment of the aforementioned 4.8 million dollars.

30) When the need will arise for a new investment in excess of the sum of 4.8 million dollars within the two years, whether it is for funding the firm, or it is to buy a machine that broke down, and Party B wishes to continue with the purchase of the firm, he is authorized to obtain a loan from the bank or from a private lender, and the firm's account will pay the interest on the loan; if Party B fails to obtain a loan, it is the responsibility of the two parties to jointly invest, and if Party B ultimately buys the sale, the new

investment will be added to the purchase price, to be added to the 40% of the purchase price that Party B will pay within 4 years of the date of signing plus 8% profit; if he will not buy it, Party A will reimburse Party B's investment within 36 months.

31) As long as the sale is not determined, any profits of the firm will stay in the firm's account to be used to fund the firm's expenses, and to return the investment of Party B, [funding of the firm for the following 3 months should stay in the firm's account]; and at the expiration of time, whoever wins the firm will also get all funds and improvements that will stay in the firm.

32) When Party B decides to buy the firm for itself, he is also authorized to take from the funds in the firm's account to pay Party A the purchase price; if he buys only half the business, he may pay the purchase price with half of the profits in the firm's account.

**Control by the Parties**

33) Even though the entire management and organization of the firm rests upon Party B alone and Party A relies upon Party B, there is nevertheless a burden upon Party B not to conceal from Party A anything that takes place at the firm; no aspect of the specific particulars should be withheld for him; Party A and his representatives are entitled

*Party A: {sig.} Jonathan Joseph Mencer {sig.} Joseph Yechiel Goldberger*
*Party B: {sig.} Joel Wercberger, {illegible signature}*

to access the plant at all times and to oversee and review financial records at all times; it may also set up an office there to in order to be able to oversee it up-close.

34) Party B will send Party A's email a weekly report of weekly expenses, and three times a year he will send him an detailed report of any advances and improvements of the firm.

35) As long as the sale is not finalized, Party A is authorized to make every decision for the firm, and if Party B does not agree with it, they should turn to the 'agent', below.

36) Even if a dispute or disagreement arises on any matter related to the firm, they will nevertheless continue to act pursuant to all provisions of this contract.

37) It is however agreed that Party B is authorized to make all kinds of decisions that are within his department in day-to-day management of the firm, as well as establishing prices for customers, even to reduce the purchase price to a firm up to 20% [a reduction beyond 20% of the purchase price must be conveyed to Party B in writing or via email, and to receive his consent or silence as described below]; however, every significant decision on the essence of business strategy, as well as if there will be a need to hire a new employee and to fire an existing employee, as well as to raise an employee's wage, as well as any decision related to an expense and investment of more than $20,000 over the course of 3 months, Party B cannot alter or decide on his own, without consulting and receiving permission from Party A; Party A's opinion is controlling in these decisions.

38) It is a burden upon Party B to report and advise Party A of any significant decision as described above, and to seek its consent; it is however agreed that if Party B sends an e-mail to Party A about a planned expense, and he will not receive a response from Party A within a full business day, then Party A's silence will be considered as if Party A consented to the expense; in the event if a significant expense above $250,000, he should wait two full business days to obtain its consent [every matter on which the parties need to obtain the consent of Party A, written consent by Mr. Jonathan is sufficient, even though Mr. Yechiel has not yet replied anything]. *However, if Jonathan does not respond, Party B must always check with Yechiel why Jonathan does not answer, and if there is reason for Jonathan's silence, Party B with Yechiel will jointly decide how decisions will be approved.*

39) In the event of disagreement between the parties about day-to-day business management, they selected an 'agent' Mr. BenZion Goldberger, and as he says, so shall be done.

40) The bank account of the firm will be in Party B's name, and they will sign the checks; Party B will always document the objective and purpose of the check and deposit in order for everything to be documented and clear for the two parties.

41) In the event of a loss, G-d forbid, whatever it may be, where the entire firm vanishes, neither of the parties bear any responsibility for the others' interest, as everyone is responsible for their own interest; [however, if some assets are retained with the firm while the firm dissolves, the remaining firm assets will be divided between the parties proportionate to their investment, i.e., if Party A invested 20 million and Party B 5 million, Party A will receive three quarters of the remaining assets and Party B one quarter of the assets; if the loss is due to negligence by one of the parties, it shall be litigated and be liable according to Jewish law.

42) The parties confirm that the sum of 3 million dollars that they are required to pay the broker Mrs. Schwartz, rests upon Party B to pay from his pocket only; Party A is not linked thereto in any way.

43) The parties agreed that it is preferable that the entire sale should be conducted confidentially, so that nothing about this sale is disclosed to anyone, as publicity could potentially cause losses and damages.

44) Every decision and message in the entire course of the business will be in writing only, via email and the like; under no circumstances will a verbal decision be accepted; even if a meeting was held with everyone's consent, he is nevertheless required to document it in an email; absent this, it is as if the meeting never took place.

45) Every email sent in order to obtain consent or inform of a decision, the subject line must specifically indicate that this email requires a response, *and it must always be in a separate email, not buried within other emails.*

*Party A: {sig.} Jonathan Joseph Mencer {sig.} Joseph Yechiel Goldberger*
*Party B: {sig.} Joel Wercberger,  {illegible signature}*

46) Party B is entitled to bring in other partners within his interest, both when he wants to buy it entirety, and when he wants to buy half of it; however, there is no requirement upon Party A to settle and conduct negotiations with those partners, as he will communicate only with Party B who will serve as a representative to the other partners.

47) However, Party B is not entitled to appoint others in his stead, to partner with Party A in his stead - only after obtaining Party A's full consent as to that partner.

**Intent and Validity of the Contract**

48) The parties reviewed and understood everything that is described in this contract, and they fully consented to all provisions.

49) It is agreed that only those conditions and provisions that are provided in this contract are binding upon the parties, all other aspects that were discussed and negotiated are null and void; even if contracts will be written in non-Hebrew languages, it is agreed that this contract prevails against any English contract, (except for a contract written in Hebrew or Yiddish which is signed with the signature of the two parties, **or if it is in an email*); it shall not be binding upon the parties at all, and shall be considered as mere talk.

50) It is also agreed in a most effective manner that no one will be able to raise the *Kim Li* {I am of such an opinion} argument against this contract, in order to void it or diminish its power; to the contrary, as long as there is even a lone opinion that supports the affect of the contract, it shall remain valid and should be considered along with all of its provisions and specifics; the position of the bearer of the contract should always prevail, and the position of the challenger shall fail; his statements shall be null and void, like one who raises an argument after a Rabbinical Court already took action; he should not be dealt with, neither under Jewish law nor under civil law.

51) In the event there is any shred of the *Ribbis*[2] prohibition, G-d forbid, with anything associated with this partnership, it is agreed that all provisions of the customary *Heter Isska*[3] or another permissible manner will apply, according to the opinion of the parties, and the opinion of Mr. Chaim Mordchai Sttosel.

52) In every disagreement and dispute that may arise between the parties with anything related to this sale and this contract, the parties will turn to a 'third' * *the 'third' here is in a non-binding manner*, who is acceptable to them both who will attempt to settle between them based on a settlement; if he does not succeed to settle, they will turn to the aforementioned 'third', or to a Rabbinical Court he will select with the consent of the two parties, or in the *ZBLA vZBLA*[4] format, and will sign an arbitration agreement, and they will issue a Rabbinical Court Ruling or a settlement as they see fit.

---

[2] Interest, prohibited under Jewish law

[3] A certain structure that allows for interest under Jewish law

[4] Each party appoints one arbitrator

We hereby acknowledge with a complete acknowledgment, like one acknowledges before a distinguished Rabbinical Court, forever irreversible, and our hand signatures below shall bear witness upon us like a hundred qualified and trusted witnesses, that everything described in this contract was entered into through a complet*e Agav Suder* binding procedure, with an object that is appropriate for binding purposes, and through other binding procedures and methods that are most effective pursuant to the rule of our holy Torah and according to state law; by our free will, free of any coercion and persuasion, and by understanding all issues; through a complete commitment assuming personal and financial guarantees of assets we currently own and that which we may acquire, effective immediately and before a distinguished Rabbinical Court, neither like a simple assurance nor like a standard form of contract; under rules of negotiations as regulated by our sages of blessed memory, like the conditions known as *Bnei Gad and Bnei Reuven*; we rescinded all declarations {to the effect of voiding this instrument}, and declarations that stem of declarations until the end of all declarations; we accepted upon ourselves the responsibility and validity of this contract, with the same responsibility and validity of contracts of commitments and sale that are customary within the Jewish community, which are made as regulated by our sages of blessed memory.

On all of this we affixed our signatures on Tuesday *Vaychi*, 13 *Teves*, 5773; {calendar date: December 26, 2012}, here in Brooklyn, NY; everything is confirmed, determined and established.

Says: {signature} Jonathan Joseph Menczer, Party A
Says: {signature} Joseph Yechiel Goldberger, Party A

Says: {signature} JoelWercberger, Party B
Says: {illegible signature} Party B

*Calendar date: December 26, 2012*

בעזהשי״ת

## שטר התחייבות למכירה

זכרון דברים מפרטי תנאים ואופני המכירה וההתחייבות שמדברו והותנו בין הצדדים, דהיינו מו״ה יונתן יוסף מענצער נ״י ושותפו מו״ה יוסף יחיאל גאלדבערגער נ״י המוכרים* [שניהם שותפים שוים מחצה על מחצה], הנקראים להלן צד א׳, ומו״ה יואל ווערצבערגער נ״י, ושותפו מו״ה יעקב ואלקאוויטש נ״י הקונים*, [ב׳ השותפים מצד ב׳ אינם שותפים שוים רק הכל כפי ההסכם שביניהם] הנקראים להלן צד ב׳, ושני הצדדים קבלו עליהם והתחייבו עצמם בקנינים ואופנים היותר מועילים עפ״י דין תוה״ק וחוקי המדינה לאשר ולקיים כל מה דכתוב ומפורט בשטרא דנא.

*או יורשיהם
*או יורשיהם

### מסחר הנמכר

א) צד א׳ הרי הוא הבעלים פירמא הנקרא בשם **Blue Beverage Group** ברשות הפירמא מגרש גדול למעלה מ15 עקערס ועליה נמצא גם באטלינג פלענט מסודר עם כל המכשירים והכלים לבאטלינג סיסטעם, והפירמא הינו הפועלת מלאכת הבאטלינג לכמה וכמה פירמאיס, וכעת החליט למכור לצד ב׳ כל הפירמא הנ״ל עם כל המגרש שבסביבו, וכל המסתעף עמו וכל הזכותים שבו והיות שצד ב׳ מעוניין לקנותו, ע״כ באו הצדדים לידי ההסכם שצד א׳ ימכור להן הפירמא עפ״י התנאים דלהלן:

ב) בהמקח נכלל:

1. הפירמא הנ״ל הנודע בשם **Blue Beverage Group** ביחד עם כל הקליינטס והקאנטראקטס.
2. כל המכשירין והכלים ששייך כהיום לפירמא הנ״ל וצד ב׳ כבר ירד להפירמא וראה הכל במו עיניו וקיבל הכל כמות שהוא [as is] ואף אם ח״ו יתקלל איזה מכונה וכו׳ לא ינוכה מחשבון סכום המקח.
3. כל המגרש שבכתובת **152 Broadway** העווירסטראה נ.י. בגודל הנ״ל
4. הבנינים העומדים כהיום על המגרש ושייכים להפירמא.
5. אף הבנינים הריקים שעל המגרש ששירות לסטארינטשינג.

### דמי המקח ותהליך המכירה

ג) צד א׳ כבר השקיע בהמקח סך של בערך אחד ועשרים מליון וחמש מאות אלף דאלער, $21,500,000 [לפי החשבונות אפשר דההשקעה הי׳ פחות מזה ואפשר אף יותר, ובמשך החדשים הבאים יבררו בדיוק הסכום ויוסיפו אותו לשטר זה בחתימות ב׳ הצדדים] וכבר הכניס לו הפירמא סך מסוים במשך השנים, ונוסף לסכום הנ״ל גם הוציא צד א׳ מארגיטש על הפירמא בסך של שש מליון דאלער, $6,000,000 שעליה משלמין בכל חודש פיעמענטס להבאנק.

ד) [דמי המקח כמה מהן הן נגד הפירמא וכמה מהן נגד הבנין תלוי בדעת ושומת צד ב׳ ובאי כחו.

ה) דמי המקח נקבע להסך של עשרים אחוזים 20% על כל דמי קרן ההשקעה שצד א׳ השקיע בהמקח, כלומר: הצדדים יעשו חשבון מפורט מכל ההשקעות שעשו במשך הזמן, וינכו מחשבון זה כל ההכנסות שהכניס צד א׳ לכיסו מפירמא במשך השנים ~~[איזהו הפירמא במשך השנים]~~, וכן ינכו סכום שהכניס צד א׳ לכיסו מהמארגיטש שקיבלו על הבנין, וינכו מחשבון ההוצאות, הוצאות המארגיטש והפעימענטס ששילמו עבורו, [ההשקעות שנתברר שצד א׳ לא הצליח עמהם ואפי׳ אם הפסידו לבסוף ( wasted money) לא ינכו כלום עבורו ועל צד ב׳ לשלמו בשלימות] ואחר כל החשבונות כאשר יהי׳ להן הסכום המדויק כמה נשאר כהיום בהפירמא מקרן השקעות צד א׳ אחר גרעון כל ההכנסות, ועל אותו הסכום יוסיף צד ב׳ עוד עשרים אחוזים 20%, וכאשר ישלם סכומים אלו נגמר כל תשלומי המקח.

[חתימות בכתב יד]

ב

ו) מלבד דמי המקח יקבל צד ב' את הפירמא עם כל ליענס הנובע מכח חובות שהשקיעו בהפירמא והמארגיטש שעליו והינו אחראי עליהם אבל שאר ליענס איתם באחריות צד ב'.

ז) צד א' התחייב עצמו באופן הרו"מ עפ"י תוה"ק וחוקי הממשלה למכור לצד ב' את מקח הנ"ל בסך הנ"ל בעת שיביא לו צד ב' סך של 60% מכל המעות, והחל מהיום בכח צד ב' להביא המעות ולקנות המקח הנ"ל כפי תנאים שבשטר זה ובסכום הנ"ל, ותיכף בעת שיביא סכום דמי המקח של 60% עובר כל המקח לרשותו ולזכותו תומ"י, שאר דמי המקח בארבעים אחוזים 40% יזקוף לחוב עיסקא על צד ב' וישלמנו עד לבסוף 4 שנים מיום חתימות שטר זה, עם דמי התפשרות של 8% לשנה, ועל צד ב' ליתן בטיחות הראוי הן על מעות הקרן והן על ריווח העיסקא כפי דעת עו"ד נארמען ווידענפעלד.

ח) כל המסחר והמגרש והבנינים נרשם כעת בתיקי הממשלה תחת קאפערשאן הנפתח ע"י צד א', ומעכשיו ירשמו הכל עפ"י דעת העו"ד מר. נארמען ווידענפעלד שנבחור ברצון הצדדים שיהי' שניהם בטוחים וכן יעשו לגבי הבנינים והמגרש, ועי"ז יובטח כ"א מהצדדים שיקבל המגיע לו עפ"י ההסכם הנוכחי.

ט) ברשות צד ב' להחליט לקנות רק חצי המקח כפי רצונו והשאר ישאר לצד א', [אבל אין חיוב על צד א' למכור לו פחות ממחצה], וכל החיובים שהתחייב עצמו צד א' לצד ב' למכור לו כל המקח, חלים גם לגבי חצי המקח, ואדרבה צד א' מעדיף למכור חצי המקח מלמכור כולו.

י) אם אכן יחליט צד ב' לקנות רק חצי המקח ישתתפו הצדדים ביניהם, ויקבעו אז תנאי השותפות והתחייבות הצדדים באופן שיתרצו הצדדים, ובדרך כלל יהי' לכל הצדדים הזכיות והתחייבות כפי חלקם ואחוזתם בהפירמא, ובכל מקרה של שותפות אין שום התחייבות על צד ב' להתעסוק בהפירמא יותר מצד א'.

יא) הותנו דדמי המקח הנקבע לעיל הינו רק באם יקנה כל המקח לעצמו, אבל אם יסכים צד ב' להישאר שותף עם צד א' שישאר לצד א' חצי המקח, יוזיל לו צד א' דמי המקח וישלם צד ב' רק חצי סכום הקרן שנשאר בהפירמא מהשקעות צד א' במשך השנים, וגם יחשבו מעות השקעות צד ב' במשך הזמן ויוכה חצי סכום ההשקעה מהסכום שצד ב' חייב לשלם בעד המקח.

יב) זמן קניית המקח נקבע בעת שיביא צד ב' דמי המקח אבל לא מאוחר מלבסוף ב' שנים מיום החתימה שישלם אז לכה"פ 60% מדמי קרן המקח, ושאר הסכום של 40% מקרן דמי המקח ישלם עד לבסוף ארבע שנים מיום חתימות שטר זה עם הוספות דמי רבית באופן המותר בסך של 8% על סכום הקרן של 40%, ושאר דמי המקח של 20% ריווח ישלם לבסוף 4 שנים מהיום בלי תשלום עיסקא, ויבטחו את צד א' כפי דעת העו"ד וכנ"ל.

יג) בעבור שתי שנים ועדיין לא שילם צד ב' 60% מדמי המקח והעיכוב אינו מכח צד א', למחרתו בטל ההתחייבות והרשות ביד צד א' למכור את המקח למי שירצה ובמחיר שירצה, ואין ביד צד ב' לעכב עליו כלום, וצד ב' יקבל בחזרה המעות שהשקיע במשך הזמן, ע"י פעימענטס שיוחלק על משך ג' שנים (36 חדשים לועזים) בלי תשלום רבית.

יד) באם יהי' איזה עיכוב מכח צד א' ומחמתו יתעכב המקח, הן לגבי טייטל אישוס או עיקול מבי"ד או מחלוקה בין שותפי צד א' וכו' בכל ענין שיהי', אזי אחר שצד א' יסדר את העיכוב יהי' לצד ב' עוד 3 חדשים לגמור המקח, ובמשך זמן העיכוב וגם הג' חדשים שאחריו יתנהגו הכל כמו בתוך שני השנים.

טו) כל מקום שנזכר בשטר פעימענט על 36 חדשים או 60 חדשים 1) יחזור המעות בלי תשולם ריווח עיסקא, 2) אין הכוונה לשלם בכל חודש פעימענט, רק בכל רבע שנה נמצא דבס"ה יהי' 12 פעימענטס, 3) אבל באופן אם יהי' בכיס הפירמא מעות יניח צד ב' בכיס הפירמא כמה העולה בערך הוצאות החזקות הפירמא בתוך ג' חדשים הבאים, וגם ישאר בהפירמא סחורה (inventory) בשווית ______$ כפי שישנו בהמסחר כהיום, או יניח מעות בסך הנ"ל ושאר המעות מכיס הפירמא יקבל תיכף צד ב' ויוכה מחשבון ~~ההוצאות~~ ההלוואות של צד ב', ורק שאר המעות שאינם בכיס הפירמא יקבל צד ב' ע"י פעימענט של 36 חדשים, 4) גם יקבל צד ב' בטוחות וערבות על מעותיו כפי דעת העו"ד ווידענפעלד.

צד א' יונתן יוסף מאנצער [signature]

צד ב' יואל ווינבערג [signature]

ג

**טז)** במקרה כנ״ל סעיף י״ג אז אין שום תביעה מצד ב׳ על עבודתו שעבד במשך הזמן בהפירמא, וגם לא עבור השבחתו בהפירמא במשך הזמן, כי אף שהשביח את הפירמא יקבל בחזרה רק קרן דמי השקעתו בלי שום הוספה.

**יז)** הרשות ביד צד ב׳ להוציא מארגיטש מבאנק על בניני ורכושי הפירמא, הן על הפירמא עצמו והן על בניני הפירמא, וצד א׳ התחייב עצמו לחתום על כל הניירות הנצרכים וישתדל בכל יכלתו להמציא כל הנחוץ לבציעות הדברים, וגם יחתום שמקבל עליו אחריות כפי דרישות הבאנק,* [ואחר תשלום המעות של 60% יפנו לעו״ד להסיר אחריות צד א׳ מהמארגיטש ~~כפי~~ Ri OK האפשרות] ומעות המארגיטש יכניס בעסקרא אצל עו״ד מר. נארמען ווידנפעלד, ויהא ברשות צד ב׳ להשתמש עם המעות, 1) לצורך החזקות הפירמא בתוך שנים הראשונים כפי אשר התחייב עצמו לשלם להחזקות הפירמא עד 4.8 מליון דאלער, ופרעון הרבית יהי׳ מכיס צד ב׳ עפ״י התי״ע 2) לצורך פרעון דמי המקח לצד א׳ ולקנות על ידו הפירמא לרשותו, והרבית על הלואות אלו ישלם צד ב׳ מכיסו עפ״י היתי״ע, [ואף אם צד ב׳ לא יקנה לבסוף הפירמא יצטרך צד ב׳ לשלם במשך ה36 חדשים את הפעימענט של המארגיטש], 3) ואם יהי׳ די מעות בהמראגיטש למעלה מסך של 4.8 מליון הרשות ביד צד ב׳ לחדש ליין חדש כפי הצורך ואחר הודעה לצד א׳, או סערוויס חדשה בהסכמות צד א׳, אבל בסעיף 3 זה ישולם הרבית ממעות הפירמא ולא מכיסו של צד ב׳.

* If needed they will add ר' [?] As signor

**יח)** כעת קיים על הפירמא מארגיטש על בנין הפירמא בתשלום רבית של 7%, ועוד הלואה פרטי על הפירמא שמשלמין עבורו 12% ויותר, והרשות ביד צד ב׳ להוציא מארגיטש גדול שישלם ממעות מארגיטש הללו גם את ההלואות הישנים, ואם יצליח צד ב׳ לקבל ההלואות עם תשלום רבית באחוז נמוך מהסכום שמשלמין כהיום, יזקוף הריווח לזכות צד ב, ועד הסכום ששילם הפירמא עד היום יוכל צד ב׳ ליקח תשלום המארגיטש מכיס הפירמא ורק הסכום שישלם יותר מסכום הישן ישלם צד ב׳ העודף על דרך משל: אם משלמין כהיום סך של $10,000 רבית על ההלואות, ואחר שיצליח לקבל המארגיטש הגדול לא ישלמו בס״ה רק סך של $12,000 לחודש, אזי הרשות ביד צד ב׳ לשלם סך של $10,000 מדמי הפירמא ויוסיף רק אלפיים דאלער $2,000 מכיסו, ואם יצליח לקבל מארגיטש גדול שלא ישלמו בס״ה רק $9,000 בחודש אזי לא יוסיף כלום מכיסו, [אבל לא יוציא מהפירמא $1,000 ריווח שהרוויח להן].

**יט)** אם יפיר צד ב׳ את הקאנטראקט ויחליט בתוך ב׳ השנים שחוזר בו ואינו מרוצה להמשיך עם המקח, אזי יודיע לצד א׳ 90 ימים מקודם שעומד לבטל המקח, ולאחר 90 מיום ההודעה יתבטל המקח, ויהא דינו כנ״ל שלא יהא לו תביעה על טרחתו ופעולתו במשך הזמן, ויקבל קרן השקעתו בחזרה בפעימענטס של 36 חדשים בלי תשלום רבית.

**כ)** אולם אם יודיע צד ב׳ שעומד לבטל המקח טרם כלות 6 חדשים נמצא דהמקח יתבטל תוך 9 חדשים, אזי מלבד שלא יקבל כלום עבור טרחתו במשך הזמן יגרע מקרן השקעתו סך של מאתיים וחמשים אלף דאלער $250,000 בתורת קנס, ויקבל רק שאר המעות בחזרה בפעימענטס של 36 חדשים, ואם לא יגיע השקעתו עד מאתיים וחמשים אלף דאלער, $250,000 מוטל להוסיף מכיסו עד סכום הנ״ל.

**תנאי ופרטי המקח**

**כא)** תיכף מהיום יכנס צד ב׳ לשרת בתור מענדזשער בתוך הפירמא, והוא מקבל על עצמו כל אחריות המקח בכל מכל כל, והוא יעמיד על גבי כל הפועלים שיעשו מלאכתם בשלימות, ומוטל על צד ב׳ לנסוע באופן רגיל למקום הפלענט כפי הצורך, כדי להשגיח ולפקח מקרוב על כל העושה והנעשה, ועליו להשתדל לטובת העסק באחריות ומסירות כאילו הי׳ כל העסק שלו וההשקעה הי׳ שלו לבדו.

**כב)** צד ב׳ ימנה פלענט מענדזשער, ויחפש אחר אדם הגון וראוי לאותו המלאכה, ופועל זה ישהה תמיד בהפלענט לנהל את פרטי הפירמא, וצד ב׳ יעמדו עמו בקשר תמידי.

**כג)** פעולת צד ב׳ כולל דעל אחריותו לסדר: 1) לפרסם את טיב ומעלות הפירמא בחוצות בדרכי פירסום המועילים, 2) לחזור ולרכל את הפירמא לקונים, 3) לקבל ההזמנות מהפירמאיס הקונים, ולסדר שיקבלו את ההזמנותיהם בעתם ובזמנם 4) לפקח ולעמוד על כל הפועלים שיעשו מלאכתם בשלימות ובזריזות בלי עצלתיים, 5) להמציא

26/12/2012 11:06 19729613058

ד

פועלים נאמנים ולעבוד עמהם ולעמוד על גביהם שיתנו שירות טובה לשביעות רצון הקונים 6) לנהל חשבון עם כל הפועלים לשלם להם משכירותם בזמנם וכן לשלם יוטולטי בילים ושאר הוצאות הפירמא וכו' בזמנם, 7) לעמוד על המשמר לתבוע ולגבות מהקונים שישלמו את הקפתם בזמנם, 8) למסור לכותב שיכתב חשבון מדיוק באופן נאה ומסודר מכל הוצאות והכנסות.

**כד)** צד ב' התחייבו עצמם שבין שניהם יתעסקו בהפירמא [דייקא בתוך הפלענט או לנסוע לצורך הפירמא] בכל שבוע לכה"פ 40 שעות.

**כה)** במקרה שצד ב' יהי' אונס כמו חולה וכדו' ח"ו, הרשות בידו למנות במקומו פועל שיעמוד תחתיו כפי התנאים הנ"ל והוצאות הפועל יהי' על צד ב'.

**כו)** במקרה שצד ב' יפשע בהנהגות הפירמא יפנה צד א' להשליש דלהלן מו"ה בנציון ג"ב נ"י, ואם גם המה יחליטו שצד ב' פשע בהנהגות הפירמא, הרשות ביד צד א' לחזור בו מהמקח, וצד ב' ישלם קנס של מליון דאלער לצד א', ואם יהא השקעות צד ב' למעלה מסכום של מליון דאלער, יחזיר לו צד א' השקעתו במשך 60 חדשים.

**כז)** אולם פשיעות בהפירמא אינו רק פשיעה גמורה שבא מתוך זילזל וקלות הנקרא GROSS NEGLIGENCE והמכריע בזה להבחין מה נכנס בגדר פשיעה גמורה יהי' ביד הרה"ג ר' אברהם ברוך ראזענבערג שליט"א ביחד עם הרה"ג ר' דניאל געלדצעלער שליט"א או מו"ה יעקב יוחנן מענדלאוויטש נ"י, ורק כאשר שניהם יחליטו דהוה פשיעה גמורה יעשו כפי קנס סעיף הנ"ל, אבל למעשה אפילו אם פשע צד ב' פשיעה גמורה, מ"מ אם החליט צד ב' לקנות המקח תיכף כאשר ישלם סך של 60% מתי שיהי', עד שתי שנים או תוך ג' חדשים אחר פסק והחלטות הנבחרים [אם הפס"ד יהי' אחר 2 שנים] אז תו אין תביעה נגדו כלום, אבל אחר כלות ב' שנים מהחתימה או אחר ג' חדשים מהפס"ד אם יהי' אין שום זכות לצד ב' לקנות עוד המקח וכנ"ל.

**כח)** כל הוצאות החזוקות הפירמא במשך הזמן עד הקניה, כולל: דמי פועלים, מכס, אינשורנס, להזמין באטלעך, לעבעילס וכו' מוטל על צד ב' בלבדו, ועליו להשקיע כל הצריך בהפירמא עד הסך של 4.8 מליון דאלער, $4,800,000, ואם יגיע ההשקעה למעלה מסכום זה הברירה ביד צד ב' לחזור בו מהמקח, ויקבל השקעתו בפעימענטס של 36 חדשים.

**כט)** כל השקעה הנ"ל היינו רק להחזיק מעמד בהפירמא הקיים כמות שהוא, אולם אם יחליט צד ב' בהסכמות צד א' לחדש עוד סערוויס בהפירמא וכדו', או ליין חדש בהסערוויסעס הישנים, אזי אותו ההשקעה אינו נכנס בגדר חשבון השקעה מ4.8 מליון דאלער הנ"ל.

**ל)** כאשר יצטרך השקעה חדשה מעל סך של 4.8 מליון דאלער בתוך השתי שנים, הן אם לצורך החזוקות פירמא, הן לצורך קניית מאשין שיתקלקל, וצד ב' ירצה להמשיך בקניית הפירמא, הרשות בידו להמציא הלואה מבאנק או ממלוה פרטי וכיס הפירמא ישלם הרבית להלואה, .אם לא ישיג צד ב' הלואה, מוטל האחריות על שני הצדדים להשקיע ביחד, וכאשר יקנה צד ב' לבסוף המקח יוסיף לו בדמי המקח כפי ערך סך השקעה החדשה שיתוסף על חלק 40% מדמי המקח שישלם צד ב' עד 4 שנים מיום החתימה עם 8% ריווח, ואם לא יקנהו יחזיר לו צד א' את השקעת צד ב' בתוך 36 חדשים.

**לא)** ריווח הפירמא כל זמן שלא נתברר המקח ישאר בכיס השותפות, וממנו יקחו לכסות הוצאות הפירמא ולהחזיר לצד ב' השקעתו [וישאר בכיס הפירמא כדי הוצאות הפירמא למשך ג' חדשים הבאים], ובכלות הזמן מי שיזכה בהפירמא יקבל גם כל המעות והשבחות שישארו בהפירמא.

**לב)** כאשר יחליט צד ב' לקנות הפירמא לעצמו הרשות בידו ליקח גם מאותן מעות הנמצא בכיס הפירמא כדי לשלם לצד א' את דמי המקח, ואם יקנה רק חצי המקח יוכל לשלם עם חצי הריווח שבכיס הפירמא נגד דמי המקח.

**כח הצדדים**

**לג)** אף שכל התעסקות וניהול הפירמא מוטל על צד ב' בלבד וצד א' יסמוך עצמו על צד ב', אעפ"כ מוטל על צד ב' שלא להעלים שום דבר מהמתרחש בהפירמא מצד א', ולא יעלימו ממנו שום פרט מפרטי הדברים, והזכות ביד צד א'

ד

ה

ובאי כחו ליכנס בכל פעם בהפלענט ולפקח ולעיין בהחשבונות תמיד, וגם יוכל לסדר שם אפיס שיוכל להשגיח על הדבר מקרוב.

(לד) צד ב׳ ישלח בכל שבוע חשבון מכל הוצאות השבוע על האי-מעיל של צד א׳, ובכל שליש שנה ישלח לו חשבון מדויק מכל התקדמות והתעלות הפירמא.

(לה) כל הזמן שלא נגמר המקח הרשות ביד צד א׳ להחליט כל מין החלטה הנוגע להפירמא, ואם צד ב׳ לא יסכים אליה יפנו להשליש כדלהלן.

(לו) אף אם יהי׳ איזה סיכסוך או חילוקי דיעות באיזה ענין הנוגע להפירמא, מ״מ יתעסקו להלאה כפי כל תנאי שטר זה.

(לז) אולם הותנו דהרשות ביד צד ב׳ להחליט כל סוג החלטה שהוא בתחום נחלתו בהנהגות הפירמא יום יומית, וכן בקביעות מחירים לקונים ואפי׳ להוזיל דמי המקח לפירמא עד 20%, [והזלה ביותר מסך של 20% על דמי המקח חייב להודיע לצד ב׳ בכתב או באי-מעיל ולקבל הסכמותו או שתיקתו כדלהלן], אולם כל החלטה גדולה בעצם תהליך המסחר, וכן אם יצטרך למנות פועל חדש או לפטור פועל ישן, וכן להעלות דמי משכורת לפועל, וכן כל החלטה הכרוך עם הוצאה והשקעה למעלה מסכום של $20,000 במשך ג׳ חדשים, אין ביד צד ב׳ לשנות או להחליט מעצמו, בלי התייעצות וקבלת רשות מצד א׳, ודעת צד א׳ גובה באותן ההחלטות.

(לח) החלטה גדולה כנ״ל החיוב על צד ב׳ לדווחו ולהודיע ממנו לצד א׳ ולשאול על הסכמתו, אולם הותנו דבאם ישלח צד ב׳ אי-מעיל מתכנית ההוצאה, ולא יקבל תשובה מצד א׳ עד עבור יום שלם של מסחר, אזי שתיקה כהודאה דצד א׳ מסכים לההוצאה, ובהוצאה מרובה מעל $250,000 ימתין עד ב׳ ימים שלמים של מסחר לקבל הסכמתו, [בכל דבר שהצדדים יצטרכו לקבל הסכמות צד א׳ די הסכמות מו״ה יונתן נ״י בכתב ואף אם מו״ה יחיאל נ״י עדיין לא ישיב כלום].

(לט) במקרה של חילוקי דיעות בין הצדדים בהנהגות הפירמא יום יומית בחרו להן את השליש מו״ה בנציון ג״ב נ״י וכאשר יגזור אומר כן יקום.

(מ) הבאנק אקאנט של הפירמא יהי׳ על שם צד ב׳ והם יחתמו על הטשעקים, וצד ב׳ יכתוב תמיד מטרת וצורך הטשעק והדיפאזעט, כדאי שיהי׳ הכל כתוב ומפורש לפי הצדדים.

(מא) במקרה של הפסד ח״ו יהי׳ מה שיהי׳ וכל הפירמא נפסדת, אין שום אחריות מאי מהצדדים על חלק חבירו, כי כל אחד אחראי על חלקו, [אולם אם ישאר איזה נכסים בהפירמא ויתבטל הפירמא, יחלק נכסי הפירמא הנשארים בין הצדדים כפי ערך השקעתם, כלומר: אם השקיע צד א׳ 20 מליון וצד ב׳ 5 מליון יקבל צד א׳ ג׳ רבעים מהנכסים הנשארים, וצד ב׳ יקבל רבע הנכסים, ואם ההפסד יהי׳ ע״י איזה פשיעה מאי מהצדדים יתדיינו עליו ויתחייב כפי הלכה.

APPROVED

(מב) הצדדים מאשרים דהסך של 3 מליון דאלער שחייבין לשלם להסירסור מרת שווארטץ תחי׳ מוטל לשלם מכיסו של צד ב׳ לבדו, ואין על צד א׳ שום שייכות בהן.

(מג) הצדדים הסכימו שכל ענין המקח עדיף שיתנהג בחשאי, ולא יתגלה מכל מקח זו לשום מישהוא, כי הפירסום בחוצות עליל להזיק ולהפסיד.

(מד) כל החלטה והודעה בכל תהליך המסחר, יהי׳ רק בכתב באמצעות אי-מעיל וכדו׳, ובשו״א לא יתקבל החלטה בע״פ, אפי׳ אם הי׳ אסיפה בהסכמות כולם אעפ״י מחויב הוא לכתבו באי-מעיל, ובלא״ה כאילו לא נתקיים כלל האסיפה.

(מה) כל אי-מעיל שמשלח כדי לקבל הסכמה או להודיע החלטה צריך לדייק ולציין בה**subject** דהאי אי-מעיל צריך לקבל תשובה.

AND IT MUST ALWAYS BE IN A SEPATE E MAIL.

ה

26/12/2012 11:06 19729613058 006 006

ו

**מו)** הרשות ביד צד ב׳ להכניס בחלקו שותפים אחרים הן בעת שירצה לקנות כולו, הן בעת שירצה לקנות חציו, אולם אין על צד א׳ שום חיוב להתפשר ולנהל משא מתן עם אותן השותפים, כי הוא יתקשר רק עם צד ב׳ שישרת כנציג לשאר השותפים.

**מז)** אבל אין רשות לצד ב׳ להעמיד אחרים תחתיו שיתשתתפו עם צד א׳ תחתיו, רק אחר שיקבל הסכמה מליאה מצד א׳ על אותו השותף.

**מונת ותוקף השטר**

**מח)** הצדדים ראו והבינו את כל המבואר בשטר הנוכחי, והסכימו מליאה לכל הדברים.

**מט)** הותנה שרק התנאים והפרטים המבוארים בשטרא דנא יתחייב הצדדים, וכל שאר דברים שנדברו והותנו בטלים ומבוטלים, ואף אם יכתבו שטרות לועזי הותנו דשטר זה גובר על כל שטר ענגליש (חוץ משטר הנכתוב בלה״ק או אידיש וחתום בחתימות שני הצדדים),* ולא יחייב כלום הצדדים, וכפטומי מילי בעלמא יחשב.

**נ)** גם הותנה באופן היו״מ ששום א׳ לא יוכל לטעון קים לי נגד שטר זה, כדי לבטלו או לגרוע כחו, ואדרבה כל זמן שימצא אפי׳ דיע׳ יחידאה המקיים כח שטר, יהא בתוקפו וידונו עליו לכל פרטיו ודקדוקיו, ולעולם יהא יד בעל השטר על העליונה ויד המערר על התחתונה, ודבריו בטלין ומבוטלין, וכטוען אחר מעשה בי״ד, ולא יתעבד לי׳ דינא לא בדיני ישראל ולא בדיניהם.

**נא)** במקרה שיהי׳ ח״ו איזה חשש רבית בכל הכרוך עם שותפות זה, הותנו דיתקיים כל התנאים עפ״י תנאי היתר עיסקא הנהוג או שאר אופן המותר כפי דעת הצדדים ודעת מו״ה חיים מרדכי שטעסל נ״י.

**נב)** בכל דיון ומריבה שיוולד בין הצדדים בכל הנוגע למקח זה ולשטר זה, יפנו הצדדים *לשליש המרוצה לשניהם שינסה לפשר ביניהם באופן פשרה, ואם לא יצליח לפשר יפנו לשליש הנ״ל או בי״ד שיבוחר בהסכמות ב׳ הצדדים, או בזבל״א וזבל״א ויחתמו על שטרי בירורין והם יוציא הפס״ד או הפשרה כפי דעתם.

ומודים אנו בזה בהודאה גמורה, וכמודה בפני בית דין חשוב דלא למיהדר בי׳ לעלם, וחתימות ידינו דלמטה תעיד עלינו כמאה עדים כשרים ונאמנים, שכל המבואר בשטר זה, נעשה בקנין גמור אגב סודר, ובמנא דכשר למקניה ביה, ובשאר קנינים ואופנים היותר מועילים עפ״י דת תורתינו הקדושה ועפ״י חוקי המדינה, מרצותינו הטוב בלי שום אונס ופיתוי, ובהבנת כל הענינים, ובהתחייבות גמורה, ובאחריות בשעבוד הגוף ונכסים דקנאי ודעתיד למקני, מעכשיו ובבית דין חשוב, באופן דלית בי׳ אסמכתא, ודלא כטופסא דשטרי, ובדיני תנאי כתיקון חז״ל, כתנאי בני גד ובני ראובן, וביטלנו כל המודעות ומודעות דנפקו מגו מודעות עד סוף כל המודעות, ואחריות ותוקף שטר זה קבלנו עלינו באחריות, וכחומר שטרי התחייבות ומכירה דנהיגי בישראל, הנעשין כתיקון חכמינו זכרונם לברכה, ועכ״ז באנו על החותם היום ג׳ לסדר ויחי י״ג ימים לחודש טבת שנת תשע״ג לפ״ק פה ברוקלין נ.י. והכל שריר וברור וקים.

| | | | |
|---|---|---|---|
| נאום [signature] צד א׳ | | נאום [signature] צד ב׳ | |
| נאום [signature] צד א׳ | | נאום [signature] צד ב׳ | |

Dec. 26 2012 למספרם